# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


HANES COMPANIES, INC.,      )
                            )

            Plaintiff,      )
                            )

      v.               )        1:08CV334
                            )

CONTRACTOR'S SOURCE, INC.,   )
                            )

            Defendant.     )

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the motion to dismiss (Docket No. 7) filed by

Defendant Contractor's Source, Inc. ("CSI" or "Defendant"). Plaintiff Hanes Companies,

Inc. ("Hanes" or "Plaintiff") has opposed the motion (Docket No. 11), and CSI has filed a

reply (Docket No. 16). The motion is ready for a ruling.

### Factual and Procedural Background

This action arises out of a series of business transactions between three companies that

deal in goods related to erosion control and environmental applications.[1] Hanes initially filed

suit in the North Carolina Superior Court for Forsyth County on April 1, 2008. (Docket No.

---

[1] Hanes brings this action to enforce the alleged rights of two separate entities, both of which are non-parties to this suit. Hanes alleges that it presently controls or has succeeded through merger or assignment to the rights of these non-party entities. Defendant has not questioned Hanes' standing to bring this suit and the Court finds no reason to do so. *See, e.g., Juidice v. Vail*, 430 U.S. 327, 331 (1977) (although raised by neither party, a court is first obliged to examine a party's standing as a matter of the case-or-controversy requirement); *see also Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1223 (4th Cir. 1980) ("whether raised or not, jurisdictional standing is an issue to be considered *sua sponte* by the court").

4, Complaint.) On May 15, 2008, CSI petitioned for removal of the case to this Court on the basis of diversity jurisdiction.[2]  (Docket No. 1, Notice of Removal.)  Hanes alleges two causes of action, one styled "CSI's Failure to Pay," which sounds in breach of contract, and the other for declaratory judgment.  (Compl. at 1-2.)

The following facts are largely undisputed.  CSI is a Louisiana corporation which maintains its principal place of business in Houston, Texas.  (Docket No. 7, Def.'s Mot. to Dismiss for Lack of Jurisdiction, Ex. A, Declaration of Gary Brecher (the "Brecher Decl.") ¶ 2.)  It is a relatively small (i.e., less than $3.7 million in average gross annual revenue), family-owned business that is engaged in the erosion control and environmental applications business in eastern Texas and southern Louisiana.  (*Id*.)  It has no offices, employees, agents or representatives in North Carolina, nor does it direct any sales or conduct any general business in the state.  (*Id*. ¶ 3.)

Hanes is a North Carolina corporation which maintains its principal place of business in Forsyth County, North Carolina.  (Docket No. 12, Affidavit of Darren N. Jones (the "Jones Aff.") ¶ 1; *see also* Compl. ¶ 1.)  Hanes controls, or is otherwise the successor to two companies,  Ikex LLC ("Ikex") and  Lone Star Geo Products, L.L.C. ("Lone Star"), with which CSI transacted business.  (Jones Aff. ¶¶ 2-4, 20.)   Hanes has brought the present action to recover monies it believes CSI owes as a result of goods sold to CSI by Ikex and Lone Star (referred to collectively as the "Hanes Entities").  (*Id*. ¶ 2.)

---

[2]  Hanes did not object to CSI's Notice of Removal.

Hanes is a part of the multi-billion dollar Leggett & Platt holding company, which maintains (through its divisions and/or subsidiaries) warehouses and sales offices nationwide. (Brecher Decl. ¶ 4.)  In 2005, Hanes purchased Ikex.  (Jones Aff. ¶ 3.)  On December 31, 2007, the two companies merged.  (*Id*.)  Prior to merging with Hanes, Ikex maintained its principal place of business in Middlesex, North Carolina.[3]  (*Id*.)  Lone Star is a wholly owned subsidiary of Hanes, which was created on November 10, 2006, after Hanes acquired the assets of Lone Star Products, LLC.  (*Id*. ¶ 4.)  The financial operations of Lone Star are presently handled from an address in Conover, North Carolina.  (*Id*.)

In years past, CSI purchased the geosynthetic products that it needed directly from Synteen, a manufacturer located in South Carolina.  (Brecher Decl. ¶ 4.)  At some point (the exact timing of which is unclear from the record), Synteen advised CSI that it had entered into a distribution agreement with Ikex and instructed CSI to forward its orders directly to Ikex for processing.  (*Id*. ¶ 4.)  Around March, 2006, CSI began purchasing goods from Ikex.[4]  (Jones Aff. ¶ 5.)

---

[3]  Throughout the relevant time period, Ikex was an independent limited liability company owned by, but not part of Hanes.  The merger occurred almost eight and half months after the last business transaction alleged to have occurred between CSI and Ikex.  (*See, e.g.*, Jones Aff. ¶ 16.)

[4]  The record is scant with details concerning the nature of CSI's relationships with the Hanes Entities.  Neither party mentions whether a contract was ever executed between CSI and a Hanes Entity, or whether CSI ever applied for or was given a line of credit, or whether CSI's orders were preceded by negotiations.  However, as discussed more fully below, it does seem indisputable that CSI generated a number of purchase orders which a Hanes Entity filled and later invoiced.

## CSI's Involvement with Ikex

During 2006, CSI purchased $323,846.92 worth of "goods" from Ikex.[5] (Jones Aff. ¶ 5.) For each purchase, Ikex sent an invoice to CSI from North Carolina.[6] (*Id*. ¶ 7.) During 2006, Ikex sent eleven (11) invoices to CSI for goods sold. (*Id*. ¶¶ 6, 16.) For each invoice that Ikex sent to CSI, CSI remitted payment to Ikex in North Carolina.[7] (*Id*. ¶ 8.) During 2006, Ikex issued credit memos to CSI on three occasions, thereby relieving it of the obligation to make payment on alleged debts that it would otherwise have owed. (*Id*. ¶¶ 9, 16.) Ikex issued these credit memos to CSI from its location in North Carolina. (*Id*. ¶ 9.)

During 2007, CSI purchased a total of $32,020.98 worth of goods from Ikex. (*Id*. ¶ 11.) On February 9, 2007, CSI purchased $5,445.02 worth of goods. (*Id*. ¶¶ 11, 16.) It is undisputed that CSI paid the full amount due for its February, 2007 purchase. (*Id*. ¶ 14.) CSI also allegedly purchased $21,130.94 worth of goods from Ikex on or about April 12, 2007.

---

[5]  With the notable exception of the April 10th Order, discussed *infra*, neither party explicitly states how CSI ordered the "goods" that it purchased from Ikex. It is unclear whether CSI called Ikex and placed orders over the phone, submitted written purchase orders electronically or via mail, placed orders through an intermediary, or utilized some other form of communication to effect their order. Moreover, the kinds of "goods" CSI ordered is not entirely apparent from the record. While it is clear that silt fencing was purchased (and allegedly failed), it is not clear whether the parties transacted for any other "goods" in their various dealings.

[6]  Plaintiff has not submitted into evidence any of the invoices that Ikex allegedly sent to CSI, opting instead to provide the Court with a chart to summarize the information contained therein (the "Jones Chart"). (*See, e.g.*, Jones Aff. ¶ 16.)

[7]  Hanes submitted copies of "[a]ll of CSI's checks to Ikex, which [it] ha[d] been able to locate." (Jones Aff. ¶ 8; *see also Id.*, Ex. 1.) In total, Hanes submitted ten (10) separate checks for various amounts, which were made payable to Ikex at an address in Middlesex, North Carolina. (*Id.*)

(*Id.* ¶ 11.) However, Plaintiff alleges that CSI only paid a portion of the amount due for its

April, 2007 purchase. (*Id.* ¶ 14.)

On or around April 10, 2007, CSI sent an order to Ikex in North Carolina for the

purchase of silt fencing (the "April 10th Order").[8] (*Id.* ¶ 10.) Ikex filled the order and then

sent Invoice No. 65-711010, dated April 12, 2007 (the "April 12th Invoice" or the "Ikex

Invoice"), to CSI seeking payment in the amount of $21,130.94.[9] (*Id.* ¶¶ 11, 13, 16.)

---

[8] Hanes submitted into evidence a copy of Purchase Order No. 5397-07, dated April 10, 2007. (Jones Aff., Ex. 2.) It appears from the record that this is the *only* purchase order that CSI sent directly to North Carolina. Plaintiff states rather vaguely that "[o]n at least one occasion, CSI directed a purchase order to. . . North Carolina" (*see* Jones Aff. ¶ 10), however, it has not introduced any other evidence to indicate that CSI did in fact send other purchase orders into the forum state.

[9] The April 10th Order is the only purchase order CSI placed with Ikex that is discussed with any level of specificity - yet, many of the details surrounding this order are still not completely clear based on the parties' filings. On its face, the April 10th Order appears to be an obvious attempt by CSI to purchase $17,325.00 worth of silt fencing from Ikex, however, a review of the record does not immediately reveal whether or not it led to a corresponding shipment from Ikex.

The Jones Chart provided by Hanes to summarize "CSI's purchases from Ikex" does not include an entry that directly corresponds to the April 10th Order. (Jones Aff. ¶ 16.) The Jones Chart does include an entry for the April 12th Invoice, which indicates that Ikex billed CSI $21,130.94 for some nondescript product (presumably silt fencing). (*Id.*) As Plaintiff did not include a copy of the April 12th Invoice among its papers, or at the least provide a more detailed description of the events surrounding it, the Court is left to surmise whether the two documents are indeed related.

Due to certain similarities between the April 10th Order and the April 12th Invoice, such as the close proximity in time, the general nearness in price terms and the fact that Plaintiff has only alleged two transactions between CSI and Ikex in 2007 (the other having taken place on or around February 9, 2007), the Court will infer that the April 10th Order and the April 12th Invoice were related to each other, such that the former most likely caused the latter. What remains unclear from the record is why CSI requested silt fencing at one price, but was charged a higher price. There is virtually no discussion regarding the level of communication and/or negotiations, if any, that took place between the parties at or around this time period, so it is nearly impossible to determine with any certainty whether the discrepancies between the April 10th Order and the April 12th Invoice were the result of a bargain between the parties, an error by one of the parties, or something else entirely.

-5-

At around the same time, Gary Brecher of CSI called Darren Jones of Hanes at his office in North Carolina to discuss "an issue with the quality of some of the material that [CSI] had purchased from Ikex."[10] (*Id*. ¶ 15.) Following the conversation with Mr. Jones, CSI unilaterally took a deduction from the April 12th Invoice and made a partial payment by Check No. 25693. (*Id*. ¶¶ 15, 16.) Hanes alleges that there is still an outstanding balance in the amount of $4,130.94 on the April 12th Invoice. (*Id*. ¶¶ 14 - 16.)

For all of the purchases CSI made from Ikex during 2006 and 2007, it is undisputed that Ikex shipped the goods F.O.B. from Middlesex, North Carolina.[11] (*Id*. ¶¶ 6, 13, 16.)

### CSI's Involvement with Lone Star

In or around April, 2007, Hanes instructed CSI to deal with the newly-created entity called Lone Star "in connection with Hanes products." (Def.'s Reply Br., Ex. A, Supplemental Declaration of Gary Brecher ("Brecher Supp. Decl.") ¶ 3; *see also* Pl.'s

---

[10] The exact date of Mr. Brecher's call to Mr. Jones is unclear from the record. The Court notes that on April 26, 2007, and August 2, 2007, Mr. Brecher also called an Ikex employee named Zachary Cox regarding the products CSI was purchasing. (Docket No. 13, Affidavit of Zachary C. Cox (the "Cox Aff.") ¶¶ 3, 6; *see also* Docket No. 11, Pl.'s Response to Def.'s Mot. to Dismiss, at 3.) Mr. Brecher was unable to speak with Mr. Cox on August 2, 2007, so he followed-up with an email regarded Ikex's allegedly failed product. (Cox Aff. ¶ 7.) During the call on April 26, 2007, Mr. Brecher requested a quote for a different type of fabric than CSI had previously been buying. (*Id*. ¶ 4.) However, Plaintiff does not allege that the quote Mr. Brecher received from Mr. Cox resulted in any further transactions.

[11] In its moving papers, CSI describes its various dealings with Lone Star with some specificity, however, it spends virtually no time at all describing its interactions with Ikex (with the notable exception of the April 10th Order and the April 12th Invoice), except to admit that it "is unquestioned that CSI had purchased erosion control product from . . . Ikex." (Docket No. 16, Def.'s Reply Br., at 2.)

-6-

Response Br., at 4.) CSI generally dealt with two Lone Star representatives, Randy Anderson and Jason Martin, who were based in Texas. (Brecher Decl. ¶ 5.)

During 2007, CSI purchased $139,375.45 worth of goods from Lone Star. (Jones Aff. ¶ 17.) At one point, Lone Star's billing was issued in Texas; however, Lone Star presently handles its billing and collection process in North Carolina. (*Id*. ¶ 18.) The Lone Star invoices in dispute were billed from North Carolina, and CSI was instructed to make payment to an address in Conover, North Carolina. (*Id*. ¶¶ 18, 19.) Lone Star has assigned its claim on the unpaid invoices to Hanes. (*Id*. ¶ 20.)

Along with the Ikex Invoice discussed above, Plaintiff claims it is still owed payment on four (4) outstanding Lone Star invoices: Invoice No. 68-075789, dated September 4, 2007, in the amount of $15,250.00; Invoice No. 68-076115, dated September 6, 2007, in the amount of $67,656.25; Invoice No. 68-077252, dated October 10, 2007, in the amount of $1,310.04; and Invoice No. 68-078147, dated November 1, 2007, in the amount of $3,975.00 (collectively referred to as the "Lone Star Invoices"). (Jones Aff., Ex. 3; *see also* Brecher Decl. ¶ 6.)

The five orders that ultimately resulted in the Lone Star Invoices and the Ikex Invoice were originally generated in Texas. (Brecher Decl. ¶ 6.) For three (3) of the Lone Star Invoices, CSI placed its orders in Texas and took delivery of the products from Lone Star's warehouse in Houston, Texas. (*Id*.) The order corresponding to the fourth Lone Star Invoice was also placed in Texas, and the product was shipped directly from Synteen in South

Carolina. (*Id*.) Finally, the order which ultimately resulted in the issuance of the Ikex Invoice was originally generated in Houston, Texas. (*Id*.) The April 10th Order was sent to Ikex in North Carolina only after Hanes' local representatives (presumably Mr. Anderson and/or Mr. Martin) instructed CSI to do so due to local inventory shortages. (*Id*.)

When CSI complained that there were problems with the silt fencing covered by the Ikex Invoice, Randy Anderson of Lone Star came to the site in Texas where the product allegedly failed in order to inspect it. (Brecher Supp. Decl. ¶ 3.) Mr. Brecher said that he was frustrated because he had initially tried to speak to someone at "the main office of Ikex" about the alleged problem, but "was directed by [Ikex] to contact Randy Anderson and deal locally with Lone Star in connection with the issue." (*Id*.)

It is undisputed that all of the products that CSI purchased from Ikex and Lone Star were used exclusively in Texas and/or Louisiana. (Brecher Decl. ¶ 5.)

## Discussion

CSI seeks dismissal of Hanes' complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Both parties have filed affidavits and other evidence in support of their respective positions on the motion.

Plaintiff bears the burden of establishing personal jurisdiction over the defendant by a preponderance of the evidence. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993); *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When a court decides such a motion without an evidentiary hearing, the plaintiff must prove at least a *prima facie* case of

-8-

personal jurisdiction. *Mylan Labs.*, 2 F.3d at 60. In determining whether a plaintiff has met this burden, the court must resolve all factual disputes and draw all reasonable inferences arising from the pleadings in the plaintiff's favor. *Id.*

Whether personal jurisdiction is proper involves a two-part inquiry. First, the court must determine whether the state long-arm statute authorizes the exercise of jurisdiction under the circumstances. *Id.* Second, if the court finds such authorization under the long-arm statute, it must then consider whether the statutory assertion of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment to the Constitution. *Id.* North Carolina's long-arm statute is interpreted liberally in favor of finding jurisdiction. *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). Federal courts consistently have construed the statute as extending jurisdiction to the full extent permitted by the Fourteenth Amendment. *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citing *Century Data Sys., Inc. v. McDonald*, 109 N.C. App. 425, 428 S.E.2d 190 (1993)). Therefore, the two-part test generally collapses into a constitutional due process analysis. *Dillon*, 291 N.C. at 675-76, 231 S.E.2d at 630-31.

The due process analysis protects a defendant against being subject to binding judgments in jurisdictions in which the defendant "has established no meaningful 'contacts, ties or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Due process demands certain "minimum contacts" with the forum such that the maintenance of the suit does not offend

-9-

"traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316-17.

When examining the sufficiency of a non-resident defendant's contacts, "[t]he touchstone

of the minimum contacts analysis remains that an out-of-state person have engaged in some

activity purposefully directed toward the forum state." *Lesnick v. Hollingsworth & Vose Co.*,

35 F.3d 939, 945 (4th Cir. 1994). There must be "some act by which the defendant

purposefully avails itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253

(1958). "Th[e] 'purposeful availment' requirement ensures that a defendant will not be haled

into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of

the 'unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475

(internal citations omitted). In short, jurisdiction is proper only where a relationship exists

between the defendant and the forum such that the defendant "should reasonably anticipate

being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297

(1980).

Personal jurisdiction may be exercised specifically or generally. Specific jurisdiction

exists when the forum state asserts personal jurisdiction over the defendant in a suit "arising

out of or related to" the defendant's contacts with the state. *Helicopteros Nacionales de

Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). For specific jurisdiction to be found,

due process requires that the defendant purposely direct its activities at the forum. *Fed. Ins.

Co. v. Lake Shore Inc.*, 886 F.2d 654, 660 (4th Cir. 1989). By contrast, general jurisdiction

is established where the defendant's contacts with the forum state have been "continuous and systematic" enough to support jurisdiction over claims that are unrelated to the continuous and systematic contacts. *Helicopteros*, 466 U.S. at 414. Thus, general jurisdiction requires "a more demanding standard than is necessary for establishing specific jurisdiction."[12] *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).

Hanes' argument is that CSI's contacts support the exercise of specific jurisdiction in this case. To establish specific jurisdiction, Hanes must show: (1) the extent to which CSI "purposely availed" itself of the privilege of conducting activities in North Carolina; (2) whether Hanes' claims arise out of those activities directed at North Carolina; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. Specific jurisdiction will exist and the fair warning requirement will be satisfied only if a defendant has "purposely directed" its activities at a resident of North Carolina and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Burger King*, 471 U.S. at 472. Various factors are important, including who initiated the contact between the parties; prior negotiations; where the contract was entered into; whether the contract was to be performed in the forum state; the number of contacts with the forum state that specifically led to the dispute between the parties; and the extent to which an ongoing relationship exists between the parties.

---

[12] Plaintiff does not contend the Court has general jurisdiction over Defendant, and a summary review of the evidence before the Court suggests that general jurisdiction in fact does not exist under these circumstances.

Hanes argues that CSI is subject to personal jurisdiction in North Carolina not necessarily due to some nexus with the state arising out of the specifically disputed invoices, but based on a combination of CSI's longstanding course of dealing with Ikex, and its subsequent decision to deal with Lone Star. (Pl.'s Response Br., at 6.) Hanes encourages the Court to look beyond the five invoices actually in dispute and render a decision based on the totality of the circumstances surrounding CSI's relationships with *both* Ikex and Lone Star. (*Id.*) In essence, Hanes argues that the Court should aggregate all of the contacts between Ikex and Lone Star on the one hand, and CSI on the other, to determine whether a sufficient basis exists for finding jurisdiction over the Defendant. (*Id.*) CSI, of course, urges the Court to limit its review to the facts surrounding only those invoices *actually* in dispute. (Def.'s Reply Br., at 2.)

Plaintiff cites a number of cases in an attempt to show that CSI has established minium contacts with North Carolina. (*See, e.g.*, Pl.'s Response Br., at 6-9) (citing, *inter alia, McCoy Lumber Indus., Inc. v. Niedermeyer-Martin Co.*, 356 F. Supp. 1221 (M.D.N.C. 1973) (finding personal jurisdiction where defendant sent six (6) purchase orders into forum state and communicated with plaintiff via mail and telephone); *Blue Ribbon Commodity Traders, Inc. v. Supermercados Mr. Special, Inc.*, No. 07-4036, 2008 WL 2468381 (E.D.Pa. June 18, 2008) (finding personal jurisdiction where defendant directed multiple purchase orders to the forum state and established a line of credit with the plaintiff); *Lantor, Inc. v. Nicassio Corp.*, No. CA0646S, 2007 WL 204015 (D.R.I. Jan. 24, 2007) (finding personal

-12-

jurisdiction where purchase orders issued pursuant to a master agreement were directed to the forum state and goods were shipped from the same); *Capster Corp. v. Pristine Indus., Inc.*, 768 F. Supp. 518 (W.D.N.C. 1991) (holding that a single contract may provide sufficient minium contacts to exercise personal jurisdiction); and *A.B. Carter, Inc. v. Fabric Resources Intern., Ltd.*, No. 3:97CV549-MU, 1999 WL 33229114 (W.D.N.C. Apr. 14, 1999), *aff'd* 217 F.3d 837 (4th Cir. 2000) (finding personal jurisdiction where a contract was negotiated out of the forum state, but subject to final approval from the plaintiff's headquarters in the forum state)). However, after careful review, the Court concludes that each of these cases is factually or legally distinguishable from the present matter in one or more important ways, as will be shown below.

In a breach of contract case, it is only the "dealings *between the parties in regard to the disputed contract*" that are relevant to the minium contacts analysis. *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 153 (3d Cir. 1996) (emphasis in original); *see also Cem Corp. v. Pers. Chemistry, AB*, 55 Fed. Appx. 621, 625 (4th Cir. 2003) (finding that only contacts related to the contract at issue are relevant to a specific jurisdiction analysis). Even prior dealings between the parties to the suit are not to be considered in a specific jurisdiction analysis. *See, e.g., Le Bleu Corp. v. Standard Capital Group, Inc.*, 11 Fed. Appx. 377, 380 (4th Cir. 2001) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277-78 (7th Cir. 1997)).

A court "cannot simply aggregate all of a defendant's contacts with a state - no matter how []similar in terms of geography, time or substance - as evidence of the constitutionally-required minium contacts." *RAR*, 107 F.3d at 1277; *see also Cem Corp.,* 55 Fed. Appx. at 625. "Thus, when conducting business with a forum in one context, potential defendants should not have to wonder whether some aggregation of other past and future forum contacts will render them liable to suit there." *RAR*, 107 F.3d at 1278. "Unless [a potential defendant's] contacts are continuous and systematic enough to rise to the level of general jurisdiction, individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another." *Id*.

As the Seventh Circuit Court of Appeals stated in *RAR*, "[t]his still leaves the obvious question, however, of how to separate those contacts that a suit 'arises out of' or 'relates to' from those contacts entirely unconnected to a suit." *Id*. "Indeed, the Supreme Court in *Helicopteros* explicitly avoided deciding 'what sort of tie between a cause of action and a defendant's contacts with a forum is necessary' for specific jurisdiction." *Id.* (citing *Helicopteros*, 466 U.S. at 415 n.10). The Court will now consider whether Hanes has shown a sufficient connection between their cause of action and CSI's contacts with North Carolina.

Hanes does not explicitly argue that the facts surrounding the disputed invoices are sufficient to establish jurisdiction over CSI when standing alone. Instead, to make its case, Hanes pulls from the combined histories that Ikex and Lone Star have had with CSI over a

-14-

period that stretches back almost two years, drawing most heavily on Ikex's relationship with CSI. Hanes' argument relies primarily on the facts that: (1) Ikex has historically shipped goods to CSI from North Carolina; (2) Ikex and Lone Star both billed CSI from North Carolina; (3) for those invoices which CSI paid, payment was generally made to North Carolina; (4) CSI issued the April 10th Order to Ikex in North Carolina; and (5) CSI directed complaints about goods to North Carolina. (*See, e.g.*, Pl.'s Response Br., at 2.)

Courts have long presumed the "institutional independence of related corporations, such as parent[s] and subsidiar[ies]," when assessing jurisdictional contacts. *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999) (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925)). "Th[e] presumption of corporate separateness, however may be overcome by clear and convincing evidence." *Id.* (citing *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)). This presumption most often arises in situations where an in-state plaintiff tries to assert jurisdiction over a non-resident corporation (usually a parent) through the jurisdictional contacts of a related company (usually a subsidiary or sister company). *See generally Saudi v. Northrop Grumman Corp.*, 427 F.3d 271 (4th Cir. 2005), *cert denied*, __ U.S. __, 127 S. Ct. 115 (2006) (jurisdictional contacts of a corporate subsidiary are generally not imputed to its parent entity); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 788 (7th Cir. 2003) (same); *Mylan Labs., supra*, 2 F.3d at 61-62 (same); *Dickson Marine,* 179 F.3d at 338 (same); *see also Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301-02 (9th Cir. 1986) (jurisdictional contacts of a

-15-

parent may not be imputed to its subsidiary); *Delta Brands, Inc. v. Danieli Corp.*, No. Civ.A.3:02-CV-0081-N, 2002 WL 31875560, at *5 (N.D.Tex. Dec. 20, 2002) (court refused to impute the jurisdictional contacts of one subsidiary to its sister company because the relationship between two subsidiaries is even more attenuated than that of a parent and a subsidiary).

While the Court recognizes that the present case is somewhat different than the normal fact pattern in which the presumption of corporate independence arises, it can see no principled reason why it would not apply equally in a situation such as the present one, where a parent corporation is attempting to aggregate all of the contacts between two of its separate (and ostensibly independent) subsidiaries and one lone defendant to form the basis for asserting *in personam* jurisdictional over that defendant. Moreover, since Hanes has not presented the Court with any precedent authorizing it to aggregate all of CSI's contacts with both Ikex and Lone Star, or otherwise suggesting that the Court should ignore the presumption of corporate independence, the Court is forced to view the two companies as separate and independent entities, and will conduct the remainder of its analysis in that light.[13]

---

[13] Additionally, it would seem inequitable on the one hand to allow a corporate family that maintained some semblance of corporate form to shield its related companies from a finding of personal jurisdiction when one or more of its members was a defendant, only to allow the very same corporate family to aggregate its collective jurisdictional contacts with a defendant when acting as plaintiffs to actually expand the geographical area where it may hale that defendant into court on the other. A party may not "use the corporate form both as shield and sword at his [or her] will." *See generally Alford v. Frontier Enters., Inc.*, 599 F.2d 483, 484 (1st Cir. 1979).

CSI initiated a relationship with Ikex after being referred to them by Synteen pursuant to the terms of a distribution agreement. Ikex and CSI undeniably did business together during 2006 and the winter of 2007. In the spring of 2007 (most likely April), Ikex (or Hanes), for reasons not stated here, initiated a relationship between CSI and Lone Star by instructing the former to deal with the latter. Hanes does not dispute that Ikex directed CSI to place its orders and take delivery from Lone Star. From that point forward, CSI purchased its erosion prevention materials from Lone Star with only one exception (when Lone Star instructed CSI to order its materials from Ikex). It is also worth noting that at the time CSI started dealing with Lone Star it had paid in full all of the invoices which Ikex had issued to it, so it cannot fairly be said that CSI had any kind of continuing obligation to Ikex.

For all intents and purposes, CSI's relationship with Ikex ended in or around April, 2007, or at least changed in a material way. At that time, CSI began a new and different course of dealing with Lone Star, and from that point on, Ikex's only real role was to act as a repository, where Lone Star could send CSI when it did not have sufficient local inventory. This assessment is supported by the fact that when CSI complained to Ikex about the goods that were sent to it following the April 10th Order, Ikex instructed it to deal locally with Lone Star in Texas, and Mr. Anderson, a Texas representative, was sent out to inspect.

The record indicates that CSI had very informal relationships with Ikex and then subsequently with Lone Star. CSI ordered products by submitting purchase orders and then paid for those products when a Hanes Entity sent it an invoice. The relationships between

-17-

CSI and the Hanes Entities were not controlled by an overarching contractual framework; Hanes has not shown the existence of a master purchase agreement, exclusivity agreement or credit arrangement between CSI and either Hanes Entity. Consequently, when Ikex instructed CSI to deal with Lone Star, it could not assign or transfer any of its rights or obligations *vis a vis* CSI to Lone Star, because it had no such rights or obligations to give. At the time CSI was instructed to deal with Lone Star it was current in its accounts payable to Ikex. Moreover, as there was no formal contractual relationship between any of the entities, neither Ikex nor Lone Star could have had any reasonable expectation that the relationship with CSI would continue on into the future as anything more than it had been in the past, an informal and sporadic relationship.

In short, CSI had a loose business relationship with Ikex, a limited liability company, which ended or changed materially in early 2007. It then began another informal business relationship with Lone Star, another independent limited liability company, during which time the invoices in dispute were issued.

Plaintiff now seeks, without citing pertinent authority, to cobble together all of CSI's contacts with these two independent business entities, to form the basis for asserting specific jurisdiction over it. Plaintiff's approach resembles in many key aspects the kind of impermissible hybrid between specific and general jurisdiction that was rejected in *RAR*. In that case, the plaintiff argued that "[t]he existence of . . . [a] long-term commercial relationship between the parties" was sufficient to satisfy the minium contacts analysis. *RAR*,

-18-

107 F.3d at 1278 (quotations omitted). The *RAR* Court found that "specific jurisdiction is not appropriate 'merely because a plaintiff's cause of action arose out of [a] general relationship between the parties [to a law suit]; rather, the action must *directly arise* out of the specific contacts between the defendant and the forum state.'" *Id.* (emphasis supplied) (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995).

While Hanes' argument to consider CSI's contacts with both Ikex and Lone Star initially appears to be similar to that of the plaintiff in *RAR*, it is actually even more tenuous than the position considered in that case. In *RAR*, the Seventh Circuit addressed the claims of a *single* Illinois company, which attempted to draw from *its own* long commercial history with an out-of-state defendant to obtain jurisdiction over that defendant. Here, Plaintiff attempts to draw not from its own direct dealings with CSI, but from the contacts of two of its separate and independent subsidiaries. On this basis alone, the Court finds that prior dealings between CSI and Ikex are too attenuated to properly be considered while assessing CSI's minimum contacts with North Carolina for purposes of the present action.

As the Seventh Circuit observed in *RAR*, "[w]e must, of course, draw the line somewhere . . . ." *RAR*, 107 F.3d at 1278. Based on the established law of this Circuit (and at least two other Circuits), the Court finds that, at a very minimum, the line for assessing CSI's contacts with North Carolina should be drawn at the moment in time when CSI began dealing with Lone Star at the instruction of Ikex and/or Hanes. *See Le Bleu,* 11 Fed. Appx. at 380 ("The magistrate judge [properly] declined to aggregate [the defendant's] other

-19-

alleged contacts with North Carolina . . . [which were] not part of the contract [in dispute],"
noting that such an inquiry would be relevant only to a *"general* jurisdiction" analysis.)
(emphasis in original); *see also Vetrotex,* 75 F.3d at 153; *RAR,* 107 F.3d at 1277-78.
Necessarily, the Court finds that the events preceding that time do not sufficiently "relate to"
or "give rise to" the present controversy, so they may not properly be considered as part of
a minimum contacts analysis.

Having found that it should not consider CSI's relationship with Ikex prior to the
spring of 2007 in evaluating whether sufficient minium contacts exists to assert personal
jurisdiction over CSI, the Court will consider whether Hanes has established sufficient
contacts between CSI and the State of North Carolina since that time.

In total, Plaintiff alleges that there are five invoices in dispute (the four Lone Star
Invoices and the Ikex Invoice), which have a combined value of $92,435.20. (Compl., at 1.)
Hanes alleges it is owed $88,191.29 on the Lone Star Invoices and $4,130.94 on the Ikex
Invoices. (*See* Jones Aff. ¶¶ 16, 18.) In other words, the Ikex Invoice accounts for
approximately 4.5 percent of the total amount in dispute.

An examination of the Lone Star Invoices reveals virtually no contacts between CSI
and North Carolina. Hanes does not dispute that CSI generally worked with only two
representatives based out of Texas when it dealt with Lone Star. Nor does it contest that all
of the orders corresponding to the Lone Star Invoices were placed in Texas. Nor does it take
issue with the fact that the bulk of the work related to the Lone Star Invoices was performed

outside of North Carolina (i.e., in three instances, CSI took delivery of the product in Texas, and in the fourth instance, the product was shipped from South Carolina). In short, it appears that the only real connection the Lone Star Invoices have with North Carolina is the fact that they were generated there and payment was due there.

As for the Ikex Invoice, Hanes makes much of the fact that the April 10th Order (which appears to be the only order CSI directed into the forum state) was sent by CSI to Ikex in North Carolina. Hanes also relies on the fact that the goods CSI ordered at that time were shipping F.O.B. from North Carolina. Hanes further points out that the resulting Ikex Invoice was sent to CSI from North Carolina and payment was due there. Finally, Hanes relies on the fact that CSI made calls to representatives in North Carolina to complain about the quality of the goods that it received in response to the April 10th Order. However, Hanes acquiesces to CSI's averment that the April 10th Order (which ultimately led to the Ikex Invoice), was originally placed in Texas and sent to Ikex in North Carolina only upon the instruction of Lone Star's local representatives.

In evaluating whether it has personal jurisdiction over CSI in the present matter, the Court must focus its analysis on the actions of CSI and its contacts with North Carolina. *See Chung v. NANA Dev. Corp.,* 783 F.2d 1124, 1127 (4th Cir. 1986) ("The significant contacts considered [for purposes of personal jurisdiction] are those actually generated by the defendant."). Moreover, the fact that CSI might have directed the April 10th Order into North Carolina does not necessarily provide the Court with a sound basis for asserting personal

jurisdiction. *See generally Burger King*, 471 U.S. at 478-79 (the mere existence of a contract with a resident of the forum does not establish the necessary contacts for due process); *see also Chung*, 783 F.2d at 1127-28.

The Court is not persuaded that it may exercise personal jurisdiction over CSI based solely on the April 10th Order. *See, e.g., Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1059 (11th Cir. 1986) ("[A] mere one-time purchaser of goods from a seller in the forum state cannot be constitutionally subject to the exercise of personal jurisdiction by the courts of the forum state.") (discussing *Owen of Georgia, Inc. v. Blitman*, 462 F.2d 603 (5th Cir. 1972)); *see also Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502 (4th Cir. 1956) (jurisdiction did not lie where a defendant's only contact with the forum state was a single interstate shipment into North Carolina); *Blue Ribbon*, 2008 WL 2468381, at *5 (E.D.Pa. June 18, 2008) ("[S]ending a few purchase orders into a forum state does not, by itself, necessarily form the basis for personal jurisdiction.") (citation omitted).

This is especially true in light of the fact that CSI was purchasing only a small quantity of goods from North Carolina, rather than injecting goods into the state through a sale. *See Borg-Warner*, 786 F.2d, at 1059 (A "nonresident purchaser might be considered to have less contact with the forum state than a nonresident seller . . . .") (citing *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982) ("[S]olicitation by a nonresident purchaser for delivery outside the forum state is a more minimal contact than that of a nonresident seller soliciting the right to ship goods into the forum state.") (parenthesis

-22-

omitted)); *see also Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596 (7th Cir. 1979).

A more relevant inquiry would be to examine how CSI came to send the April 10th Order to Ikex in North Carolina in the first place. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000) (finding no personal jurisdiction where the plaintiff initiated the parties' contractual relationship). The Fourth Circuit has given great weight to the question of who has initiated the contact between the parties. *Id*. Here, it is undisputed that CSI did not seek out Ikex on its own in April, 2007 – it was directed to Ikex by Lone Star only after it originally tried to place its order in Texas. While this fact alone is not necessarily dispositive, it does mitigate against asserting jurisdiction over CSI. *Id*. Further, in *Diamond Healthcare*, the Fourth Circuit held that this type of unilateral activity by the plaintiff cannot create personal jurisdiction over a defendant. *Id*. at 452 (finding that interactions between plaintiff's headquarters and its employees in the field could not form the basis for asserting jurisdiction over a nonresident defendant); *see also Baytree Assoc., Inc. v. Dantzler, Inc.*, No. 3:06-cv-00489-W, 2007 WL 2461922, at *3 (W.D.N.C. Aug. 27, 2007) (same).

The Court is also not persuaded by the fact that CSI may have placed a limited number of calls and/or sent an email to representatives in North Carolina to remedy allege flaws in the products that it had purchased from Ikex. *See Eagle Paper Int'l, Inc. v. Expolink, Ltd.*, No. 2:07cv160, 2008 WL 170506, at *5 (E.D.Va. Jan. 17, 2008) ("[I]t is well settled that

-23-

mere telephone calls and electronic communications in furtherance of a transaction are insufficient to constitute purposeful activity.") (citing *Superfos Invest., Ltd. v. Firstmiss Fertilizer, Inc.*, 774 F. Supp. 393, 397-98 (E.D.Va. 1991); *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 391, 396 (E.D.Va. 1984)). Further, the mere fact that one or more of the disputed invoices may have been generated in North Carolina, and payment on said invoices may have been due there is equally unpersuasive. *See Diamond Healthcare*, 229 F.3d at 452 (defendant's remittal of payment into a forum state is but an "attenuated contact" with the forum); *see also Eagle Paper*, 2008 WL 170506, at *5 (defendant's payments into the forum state did not support a finding of jurisdiction where plaintiff generated invoices and instructed defendant on where and how to make payments); *McQuay, Inc. v. Samuel Schlosberg, Inc.*, 321 F. Supp. 902 (D. Minn. 1971). *See generally Scullin Steel*, 676 F.2d at 314 (The "use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the minium contacts required by due process.") (internal quotations omitted).

In *Eagle Paper*, the plaintiff, a Virginia paper distributor, entered into an agreement with the defendant, an Israeli company, whereby the defendant would serve as its exclusive agent. *Eagle Paper*, 2008 WL 170506 at *2. It was the parties' practice for the defendant to place orders with the plaintiff's office in Israel, which in turn were transmitted to the plaintiff's headquarters in Virginia. *Id*. The plaintiff then shipped goods from Virginia and

-24-

other places, which the defendant accepted. *Id*. As part of their commercial relationship, the parties also exchanged a number of phone calls and electronic correspondence, which often involved people in Virginia. *Id*. Further, the plaintiff sent invoices from Virginia to the defendant which stated that payment was due in Virginia. *Id*. When the parties' relationship soured and the Virginia company sued, it relied heavily upon these facts as the basis for asserting personal jurisdiction over the defendant. *Id*. at *5. However, the district court found that the defendant clearly had not purposefully availed itself of the privilege of conducing business in Virginia. *Id*.

In so doing, the court found that the defendant's contacts with Virginia had been generated by the plaintiff and were ancillary to its role under the contract. *Id*. Relying upon *Diamond Healthcare*, the Court found that the plaintiff acted unilaterally when it transmitted the defendant's orders (which had been originally placed in Israel) to Virginia for processing. *Id*. The Court also found the fact that the defendant had accepted goods shipped from Virginia insufficient to establish jurisdiction, as the plaintiff (not the defendant or the parties' contract) determined the source of the products to be shipped. *Id*. The Court took the time to note that the plaintiff was a distributor of goods, not a manufacturer, who brokered paper from mills around the world through a number of ports. *Id*. n3. Therefore, the Court reasoned, the defendant could not have been found to have purposefully directed its activities at Virginia simply because the plaintiff's goods may have traveled through there. *Id*. The Court likewise rejected the plaintiff's argument that it should find jurisdiction because the

-25-

plaintiff had issued invoices from Virginia, which directed that payment be made to the same location. *Id*. at *5. Finally, the Court dismissed as unfounded the plaintiff's claim that it should find jurisdiction based on the parties exchange of communications during their relationship. *Id*.

This Court finds that *Eagle Paper* provides important guidance, as the district court there dealt with a fact pattern similar to the case at bar and addressed virtually the same arguments as those presently advanced by Hanes. As did the plaintiff in *Eagle Paper*, Hanes has placed far too much importance upon the fact that the disputed invoices were sent from North Carolina and payment was due to the same. As discussed above, this is precisely the kind of unilateral activity by a plaintiff which cannot form the basis for a finding of personal jurisdiction over a defendant. Also, Hanes places too much emphasis on the fact CSI made a handful of calls and sent an email to North Carolina to discuss perceived shortcomings in the products it received. This also does not form an adequate basis to assert personal jurisdiction over CSI, especially since the communications were sent after the product allegedly failed and were remedial in nature. Further, Hanes' argument that jurisdiction should be found because Ikex shipped goods to CSI from North Carolina is equally unavailing. There is no indication in the record that anyone other than Ikex controlled the source of the products to be shipped. Moreover, there is nothing in the record to indicate that CSI's order called for products located in North Carolina. Like the plaintiff in *Eagle Paper*,

-26-

the record indicates that Ikex was primarily a distributor of geosynthetic products.[14]  This Court finds, as the *Eagle Paper* court did, that the mere fact that a distributor's goods may have passed through the forum state is an insufficient basis to assert personal jurisdiction over the eventual recipients of those goods.

This leaves the Court with only the April 10th Order as a potential basis for asserting personal jurisdiction over CSI.  As stated above, there is a substantial body of case law which would counsel against the exercise of jurisdiction over CSI based only on a one time purchase of goods from Ikex in North Carolina.  Moreover, the Court is unaware of any case or authority that would even tend to indicate that a finding of jurisdiction would be appropriate under these facts.  As Hanes has failed to cite to any such precedent, the Court should refrain from asserting personal jurisdiction over CSI in this matter.[15]

---

[14]  Plaintiff does not allege that Ikex manufactured the silt fencing that formed the basis of the disputed invoices.  Further, a review of the invoices submitted to the Court quickly reveals that CSI had been purchasing "Synteen" silt fencing.  (*See* Jones Aff., Ex. 3.)

[15]  The Court sees very little difference between the present situation and the fact pattern discussed in *Eagle Paper*.  In that case, it was the parties' practice for the defendant to place orders with the plaintiff's office in Israel, which were then transmitted to the forum state for processing. Here, it was the parties' practice for CSI to place orders with either Mr. Martin or Mr. Anderson in Texas.  In the instance of the April 10th Order, it is clear that CSI attempted to place its order in Texas, as it generally did, but was instructed by local representatives to send its order to Ikex in North Carolina.  While the Court recognizes that this is a somewhat different situation than in *Eagle Paper*, the distinction is only slight.  As a practical matter, the Court sees no reason to distinguish this situation, where the Defendant placed its order in Texas and then was instructed to send its order to North Carolina, from *Eagle Paper*, where the defendant placed its order in Israel and the plaintiff transmitted it to Virginia.  In both instances, the order ultimately ended up in the forum state at the direction of the respective plaintiffs.

Hanes has cited a number of cases in an attempt to support its position; however, for a variety of factual and legal reasons, each of these cases is distinguishable. First, the Court observes that the primary cases Plaintiff relies on would have applicability to the present case only if the Court were to aggregate all of CSI's contacts with both Ikex and Lone Star over a period of almost two years. Second, the Court considers that in the other cases cited by Plaintiff there was a demonstrably higher level of contacts between the defendants and the forum state in terms of quantity and/or quality.

As the Court has declined to aggregate all of CSI's contacts with North Carolina over a period of almost two years, the *McCoy*, *Blue Ribbon* and *Lantor* cases discussed above have very little relevance to the present action.[16] Each of these cases stands merely for the general proposition that a Court may assert personal jurisdiction over an out-of-state purchaser based on its established course of dealing with an in-state seller, where the action "arises from" or "relates to" that course of dealing.

In *McCoy,* the court found that six disputed purchase orders sent by a particular buyer to a particular seller in the forum state could form the basis for jurisdiction where a significant amount of the goods (38.9 percent) were shipped from the forum state and the purchase orders were accompanied by approximately fifty person-to-person calls and various mailings. *McCoy*, 356 F. Supp. at 1223-26. In *Lantor*, a Rhode Island district court held that

---

[16] This Court is of course not bound by either the *Lantor* case, nor the decision in *Blue Ribbon*. *See McCoy*, 356 F. Supp. at 1225 (addressing a case from the District of New Jersey). However, the Court need not disregard these cases as they are easily reconciled with the present controversy due to their distinguishable fact patterns.

-28-

a series of seven disputed purchase orders placed pursuant to a master purchase agreement over approximately two months could form the basis for asserting jurisdiction over an out-of-state purchaser. *See Lantor*, 2007 WL 204015. Likewise, in *Blue Ribbon*, a Pennsylvania district court found that it had personal jurisdiction over an out-of-state purchaser where that party applied for and received a line of credit from an in-state seller, sent a number of purchase orders over a period of approximately sixteen (16) months into the forum pursuant to that credit agreement and subsequently failed to pay for the resulting shipments. *See Blue Ribbon*, 2008 WL 2468381. Further, it is worth noting that the *Blue Ribbon* court stated that the aforementioned facts presented "a close case." *Id*. at *5.

The facts of this case, however, are not so "close." As discussed above, the Court really has only one purchase order (the April 10th Order) to consider for purposes of establishing minimum contacts with North Carolina, and it was not issued pursuant to any master purchase agreement or credit facility, nor was it accompanied by fifty or more phone calls.[17] While the present case is obviously distinguishable from *McCoy, Lantor* and *Blue Ribbon* based solely on the facts, it is worth noting that the *McCoy* Court took great pains to distinguish itself from the Fourth Circuit precedent set forth in *Erlanger Mills*, 239 F.2d 502. *McCoy*, 356 F. Supp. at 1224-26. The *McCoy* Court did this by pointing out that: (1) there

---

[17] Plaintiff has not alleged that there were any discussions or negotiations proceeding the April 10th Order. In fact, it appears that the only times CSI discussed the April 10th Order with anyone were when: (1) it attempted to place the order in Texas and was instructed by local representatives to send it to North Carolina; and (2) it called to complain about the product that it had received.

were six transactions in dispute instead of only one; (2) the defendant had initiated contact with the plaintiff; (3) the defendant repeatedly called the plaintiff; and (4) the amount in controversy that related to the forum state was substantially higher that in *Erlanger Mills*. *Id*. Using these same factors, it is doubtful that the *McCoy* Court would have found jurisdiction under these circumstances.[18]

Hanes also cites *Capster* and *A.B. Carter,* discussed above, to support its position; however, both of these cases involve fact patterns which are materially different from the case at hand. Therefore, they can offer Plaintiff no help.

Plaintiff cites *Capster* for the general proposition that a single contract may provide sufficient minium contacts to exercise personal jurisdiction over a defendant. *Capster* involved a North Carolina seller that entered into a contract with an out-of-state purchaser to supply textile garments. *Capster*, 768 F. Supp. at 520. The defendant in that case failed to pay invoices issued pursuant to the parties' contract in the amount of approximately $60,000 dollars and the plaintiff stopped a subsequent shipment of textiles that had been produced for the defendant worth almost $75,000. *Id*. The court found that it could exercise

---

[18] In addition to the fact there is only one invoice at issue which "relates to" or "arises out of" CSI's contacts with North Carolina, the present case is also distinguishable on a number of other grounds. Namely, here it was Lone Star, not CSI that initiated the contact between CSI and the forum. Moreover, there is no evidence that CSI placed any calls at all to the forum until after the goods were delivered and the product had allegedly failed. Even then Plaintiff only alleges a handful of remedial communications. Finally, it is worth pointing out that the total dollar value of that portion of the claims attributable to the April 12th Invoice (i.e., those goods shipped from North Carolina) is but a small fraction of the total amount in controversy (approx. 4.5 percent). This stands in opposition to the much more substantial amount discussed in *McCoy* (approx. 38.9 percent).

jurisdiction over the defendant due to the fact that the parties had entered the contract, the defendant had made numerous calls and sent numerous fax transmissions related to the contract into North Carolina, and the defendant's president had visited the plaintiff's in-state manufacturing plant. The parties here did not enter into a formal contract, nor did they engage in significant communications, nor did any representative from CSI ever visit North Carolina.

Similarly, the present case is also distinguishable from *A.B. Carter* due to obvious factual differences. In that case, the Court found that it had personal jurisdiction over an out-of-state defendant where the parties had met in New York to negotiate a contract, which was ultimately subject to the final approval of people at the plaintiff's home office in North Carolina. *Carter*, 1999 WL 33229114. As the parties here did not enter such a formal contract, *A.B. Carter* has little bearing on the case *sub judice*.

On review of the factual record made by the parties and the pertinent case authorities, the Court concludes that the exercise of personal jurisdiction over CSI in this case would offend the Due Process Clause and is therefore prohibited. CSI's Rule 12(b)(2) motion to dismiss should be granted.

-31-

## Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion to dismiss (Docket No. 7) be granted based on the Court's lack of personal jurisdiction over the Defendant.

__/s/ P. Trevor Sharp__
United States Magistrate Judge

Date:  October 6, 2008